UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

FRANCIS BARRIOS,                                                        Plaintiff,

v.                                              Civil Action No. 3:18-cv-132-DJH-RSE

CALEB ELMORE,                                                        Defendant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiff Francis Barrios, a former professor at Bellarmine University, alleges that a Bellarmine student, Defendant Caleb Elmore, threatened to kill him and destroy his career. (Docket No. 52, PageID # 862)  This Court granted Elmore's motion to dismiss as to all but three claims: terroristic threatening, assault, and intentional infliction of emotional distress.  (D.N. 15)  Elmore now moves for summary judgment on the remaining claims.  (D.N. 49)  For the reasons set forth below, the motion for summary judgment will be denied.

## I.

While an undergraduate student at Bellarmine, Elmore worked as a research assistant for Barrios, a chemistry professor.  (D.N. 52, PageID # 861)  On September 6, 2017, Elmore and Barrios met on campus in Barrios's office.  (*Id.*; D.N. 48, PageID # 502)  Another student in the room joined in the conversation between Barrios and Elmore as well.  (D.N. 48, PageID # 502) Elmore informed Barrios that he intended to seek "double credit" for an upcoming foreign study course.  (D.N. 52, PageID # 861)  Barrios advised Elmore that he would not support "such a scheme" and that Elmore "need[ed] to be careful with double-dipping."  (*Id.*; D.N. 48, PageID # 508)  According to Barrios, Elmore became increasingly agitated and hostile, threatening to destroy Barrios's career and telling him: "Listen mother f\*\*\*er, if you f\*\*\* with my future I'll put

1

a knife . . . up your throat" and "Don't f*** with me because I will kill you."  (D.N. 48, PageID #

510)  Elmore also said that he would do everything possible to get Barrios fired if he "f***ed with

[Elmore's] future," that Elmore was going to "rain down" on Barrios, and that the "only double-

dipping [Barrios] would see was frying fries at McDonald's."  (*Id.*, PageID # 511)  Barrios says

that while stating these threats, Elmore sat on the edge of his chair simultaneously making a motion

depicting a knife going up his throat.  (*Id.*, PageID # 510)

Once the incident was over, Elmore grabbed his computer and walked to the lab behind

Barrios's office.  (*Id.*, PageID # 511)  According to Barrios, as Elmore left the lab, he stopped and

said to Barrios one more time, "Don't f*** with me" and "You better not f*** with my future."

(*Id.*, PageID # 513)  Barrios testified that because he was unsure of what to do next, he did not call

for help that day and did not make any effort to find the chair of the chemistry department,

Dr. Patrick Holt.  (*Id.*, PageID # 513, 515)  Instead, Barrios went back to his office, collected his

belongings, and went home.  (*Id.*, PageID # 513)  Barrios responded affirmatively when asked

whether the incident made him concerned that Elmore was going to do something similar to the

mass shooting incidents described in his complaint.  (D.N. 48, PageID # 419)  Barrios explained

that he felt this way because of how Elmore reacted and the way Elmore left at the end of the

encounter.  (*Id.*, PageID # 418-49)

Barrios emailed Elmore later that day.  (D.N. 48-15, PageID # 804)  In his September 6

email to Elmore, Barrios said:

> After today's incident in my office, I'm honestly not sure if I feel comfortable being
> the research advisor of a student who has threatened to get me fired.  I don't think
> your conduct was acceptable in my office, [e]specially when you called me names in
> front of another student.  If you want to talk about this, please let me know before we
> move on to the next steps.

(*Id.*)  Barrios testified that he did not mention the physical threat because he "wasn't planning on

meeting with [Elmore] one[-]on[-]one" and did not want to "seed in [Elmore's] head the idea that

he could actually hurt me again." (D.N. 48, PageID # 521) Soon after he sent Elmore the email, Barrios changed his mind and was no longer willing to meet with Elmore. (*Id.*, PageID # 519)

The next day, Barrios reached out to the other student who was present in his office during the incident. (*Id.*, PageID # 516) When asked whether she remembered the "double-dipping" conversation with Elmore, the student responded: "Not exactly, but I remember parts and that [Elmore] said a few things that were very uncalled for." (D.N. 48-13, PageID # 801) In her statement, the student witness recalled that Elmore got very upset during the meeting and "started making threats of things he would do if Dr. Barrios prevented him from fulfilling both credits with his class." (D.N. 52-1, PageID # 876) She further stated that "[Elmore] made numerous threats which seemed to go on for an unusually long amount of time" and that she is certain that she remembers Elmore saying "it would rain down on [Barrios]," that "[Barrios] would no longer have a job here," that Elmore would kill Barrios, and that Elmore called Barrios a "motherf***er during his rant." (*Id.*) The student said she was not surprised when she received an email from Barrios about the situation because the "conversation sat heavy in [her] mind and [she] assumed that the conversation had been on Dr. Barrios'[s] mind as well." (*Id.*) While the student did not specifically remember Elmore saying he would hold a knife to Barrios's throat, she said that it would not surprise her if this were one of the threats made because she was certain she heard Elmore say he would kill Barrios. (*Id.*)

Barrios also reached out to Holt on the evening of September 7, 2017. (D.N. 48-3, PageID # 604) According to Holt, Barrios called him and described a conversation in which Elmore first said that he would see to it that Barrios was fired and then threatened to kill him, saying that he would hold a knife to Barrios's throat. (*Id.*) In his statement, Holt explained that Barrios decided to call him to determine how to proceed "[a]fter thinking this over for a day," and

that Barrios told him that he feared for his life and did not feel comfortable having Elmore work in his research lab. (*Id.*) According to Holt, it seemed clear that Barrios was frightened and was fearful of retaliation. (*Id.*)

Barrios emailed Elmore again the following day, September 8, 2017, saying that he was willing to set up a meeting between Elmore and Holt. (D.N. 48, PageID # 524) According to Barrios, the meeting was scheduled for September 11, 2017, but Barrios changed his mind and postponed the meeting, saying that he "didn't feel comfortable being with [Elmore] in the same room." (*Id.*, PageID # 525) Holt met with Elmore on September 13, 2017, and advised him that Barrios no longer felt comfortable serving as his research advisor. (D.N. 52, PageID # 862) Holt asked Elmore to voluntarily withdraw from the research project and to refrain from contact with Barrios, but Elmore refused. (*Id.*) Holt then advised the Dean of Students, Dr. Sean McGreevey, of these events and Elmore's refusal to withdraw from the research project. (*Id.*) Holt and McGreevey advised Barrios that his only alternative was to file a formal incident report. (*Id.*)

Barrios filed a formal statement with McGreevey on September 23, 2017, saying that although he wanted to let the incident go and not tell anyone, the more he thought about Elmore's disturbing words, the more uncomfortable he felt. (D.N. 48-21, PageID # 815) In describing how the incident affected him, Barrios said:

> This incident has changed the way I do things at work. Coming in for work is not the same anymore, being in my office doesn't feel right, walking in the hallways is just uncomfortable and even having lunch . . . is not enjoyable anymore. As suggested by [other faculty], I will be seeking counseling to help me get over this situation.

(*Id.*) Barrios says that he decided to file the formal incident report for his "own protection and for the protection of others at Bellarmine" and because he was concerned about Elmore's "stability and propensity for threatening behavior and/or violence, and how that might further manifest itself going forward." (D.N. 48-1, PageID # 579)

On September 25, 2017, Barrios filed a formal complaint with Bellarmine alleging that Elmore violated the Student Code of Conduct by threatening to kill him, and Bellarmine promptly began a formal investigation. (D.N. 49, PageID # 833) Barrios said that he initially decided not to be present during Elmore's hearing process, but later changed his mind and decided to participate. (D.N. 52, PageID # 534) He testified that he agreed to be a part of the conference call so long as he was not in the same room as Elmore. (D.N. 48, PageID # 535) Barrios told McGreevey that he changed his mind because it seemed as though his participation was important, and he apologized for being "somewhat difficult during the process," explaining that "this entire event has just been very stressful." (D.N. 48-22, PageID # 817)

On October 5, 2017, Elmore filed a complaint under Bellarmine's Sexual Misconduct Policy alleging that Barrios sexually harassed him. (D.N. 49, PageID # 834) Specifically, Elmore claimed that Barrios retaliated against him "for not returning Barrios's obvious sexual overtures." (D.N.48-3, PageID # 586) Bellarmine deferred its investigation into Barrios's report pending an investigation into Elmore's harassment claims. (D.N. 52, PageID # 863) Upon completion of its investigation, however, Bellarmine determined that Elmore could not sustain his claims of harassment. (*Id.*) After it resumed its investigation into Barrios's report, the university concluded that Elmore had threatened violence. (*Id.*, PageID # 864) Barrios was fired by Bellarmine on December 21, 2017, however, for engaging in an inappropriate relationship[1] with Elmore and for

_____

[1] The university found that text messages between Barrios and Elmore disclosed during the investigation "reflected extensive sexual innuendo" and found that Barrios's history with Elmore was "egregious." (D.N. 48-2, PageID # 583) It noted, however, that it appeared to be a consensual relationship and that Barrios's statements were "most often countered with a sexual comment from [Elmore.]" (D.N. 48-3, PageID # 591)

failing to report Elmore's previous threats against another Bellarmine professor.[2]  (D.N. 48-2,

PageID # 583)

When asked to describe in detail the damages he suffered as a result of Elmore's threats,

Barrios said that in addition to having anxiety:

> I'm paranoid.  I fear for my life.  I feel like . . . people are watching me, that I'm
> going to get hurt eventually at some point.  I don't feel safe [in] the places that I
> go.  I think about it every night.  I cannot sleep.
> . . . .
>
> I don't trust people.  I'm always looking behind my shoulder.  I see something
> suspicious.  I think people are on to me.  If just a random car parks by me and
> looks at me I think . . . they are going to do something to me.  If I see random cars
> just driving by my home, I think . . . they are just looking to see where I live and
> watching me.

(D.N. 48, PageID # 424-26)  Barrios testified that these feelings occur every day and "last[] all

the time," attributing these symptoms solely to the September 6 incident.  (*Id.*, PageID # 427)

Barrios says the incident has also affected his memory, ability to concentrate, and energy level, as

he does not sleep well and is always tired during the day.  (*Id.*, PageID # 429)

When Barrios first went to see his family physician, Dr. Sheri Weber, in June 2018 about the

mental distress he claims to have suffered as a result of Elmore's actions.  (*Id.*, PageID # 399)

Barrios said that he did not have the opportunity to speak to any doctors about his mental distress

prior to that point because he was unemployed and without health insurance.   (D.N. 48,

PageID # 399)  Barrios explained that although he had health insurance while still employed at

Bellarmine in September 2017  (*id.*, PageID # 400),  he did not see a doctor at that time because

as he was "waiting for things to happen" and "looking for information, where to go, that's when

[Elmore] filed his sexual harassment claim."  (*Id.*, PageID # 401-02)  When Barrios discussed

---

[2] Specifically, Elmore threatened another Bellarmine professor in text messages on July 3, 2017,
saying that he would "destroy" the professor and that the professor was "f***ed for messing with
[him]."  (D.N. 48-3, PageID # 608)

possible depression with Weber on June 6, 2018, Weber noted that Barrios's mood and affect were normal and did not prescribe any medication or therapy. (D.N. 49, PageID # 839) Barrios's medical records from a later visit in September 2018 state that the purpose of his visit was "to discuss mental[-]illness concerns" and to "start something for his stress." (D.N. 49-1, PageID # 849) During that visit, Weber diagnosed Barrios with situational depression; prescribed him an antidepressant, which he still takes; and referred him to a social worker for therapy. (D.N. 48, PageID # 404; D.N. 49-1, PageID # 849-51)

Barrios first saw a therapist in October 2018. (D.N. 48, PageID # 433) Barrios explained that he did not try to see a therapist sooner because he thought he "could handle it [him]self and [he] could get over it [him]self as well." (*Id.*, PageID # 403) Barrios also said that he did not ask for a referral the first time he went to visit his primary doctor because the doctor thought Barrios might have lymphoma, and so his "attention and energy w[ere] put into that, into trying to figure out th[o]se health issues." (*Id.*, PageID # 433) According to Barrios, he "hit bottom" in October 2018 after "several months and months and months of trying to deal with it by [him]self and . . . the longer or the more time it took or as time passes, [it] just got worse and worse instead of getting better." (*Id.*, PageID # 435-36) Barrios said that once it got to this point, he went to his primary care doctor and told her, "I cannot handle this anymore . . . I need help." (*Id.*, PageID # 437) The notes in Barrios's patient records state that Barrios has "possible PTSD-type issues," though his therapist has not discussed this with him. (*Id.*, PageID # 439-40) The notes also say "rule out trauma, PTSD." (*Id.*, PageID # 440) The notes include, in the doctor's "handwriting, an observation that Barrios "ha[d] suicidal thoughts." (*Id.*, PageID # 438) Barrios confirmed that he has suicidal thoughts, but he testified that he has no plans to act on them. (*Id.*)

Elmore has obtained an expert opinion from Dr. Timothy Allen, a forensic psychiatrist, who disagrees with Barrios as to the cause of his symptoms.[3] (D.N. 38-1) Allen found it "difficult to believe, and contrary to my experience of thousands of individuals who have experienced life-threatening situations, that a single verbal threat from an angry teenager that allegedly occurred on September 6, 2017, continued to affect Dr. Barrios as of his deposition [in] October 2018, to a substantial degree." (*Id.*, PageID # 287) Allen found the "much more likely causative factor for any psychiatric diagnosis" to be Barrios's "dismissal from his faculty position." (*Id.*) Allen explained in his report that

> [t]he loss of the possibility of attaining lifelong professional goals and the abrupt transition of his professional potential was a difficult situation tantamount to a loss which people grieve, not unlike the death of a loved one. Such loss is frequently associated with the development of depressive symptoms.

(*Id,*) Allen also found that that Barrios's "delayed attempts to access such treatment is an indicator of the lack of severity." (*Id.*) Allen opined that "[i]f the threat actually occurred . . . it remains highly unlikely that Dr. Barrios would develop long-term psychological and physical symptoms to that single verbal threat even after [13] months and now 400 miles between [Barrios and Elmore]." (*Id.*, PageID # 288) On January 22, 2019, Allen sent a supplemental report after reviewing additional records, including Barrios's medical records. (D.N. 53-1, PageID # 997) Allen supplemented his previous findings and concluded that "Barrios suffered from depressive symptoms in the summer of 2018 primarily related to his loss of career and personal identity" and that this "was exacerbated by [Barrios's] 'cancer scare'" from June to September 2018. (*Id.*, PageID # 998 )

---

[3] Allen did not treat or examine Barrios but reviewed documents related to the case including Barrios's deposition. (D.N. 38-1, PageID # 285)

Barrios testified that he was not depressed about his termination and that he had moved on but could not get over "[Elmore] telling me that he will put a knife up my throat . . . because the more I think about it, the more it hunts me down." (D.N. 48, PageID # 394, 408) Barrios says that after the September 6 incident, he never felt safe again at Bellarmine and still does not feel safe. (*Id.*) When asked whether the threat of lymphoma scared him, Barrios responded that while it took him by surprise, it was nothing he could not handle with the help of doctors, and that there was "no reason to be upset." (*Id.*, PageID # 435) In addition to his own testimony, Barrios has disclosed as experts his family physician, Dr. Weber, and his clinical therapist, James Baranski, and noted that he may call these individuals to testify regarding their care and treatment of him; his injuries and damages, emotional distress, anxiety, and related conditions; and the suspected cause(s) of his symptoms. (D.N. 58, PageID # 1009-10)

Barrios originally sued Elmore and Elmore's parents—Reza Rashidian and Dyna Elmore—in Jefferson Circuit Court. (D.N. 1-3) Elmore removed the action to this Court on March 5, 2018. (D.N. 1) In his complaint, Barrios asserted claims of terroristic threatening, assault, intentional infliction of emotional distress, defamation, and abuse of process against Elmore, and claims for abuse of process and defamation against Elmore's parents. (D.N. 1-3) The Court dismissed Barrios's abuse-of-process (Counts V and VI) and defamation (Counts IV and VII) claims, but found that Barrios's remaining claims against Elmore could proceed. (D.N. 15, PageID # 149) Elmore now seeks summary judgment on all remaining claims (Counts I-III). (D.N. 49, PageID # 829)

## II.

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a); *see* 56(c)(1). For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2)-(3). To survive a motion for summary judgment, the nonmoving party must establish a genuine issue of material fact with respect to each element of each of his claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (noting that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial"). In Counts I and II of his complaint, Barrios asserts claims of terroristic threatening and civil assault under Kentucky statutory law. (D.N. 1-3, PageID # 24-25) In Count III, Barrios alleges that Elmore's actions were taken deliberately to inflict emotional and mental distress. (*Id.*, PageID # 25-26)

## A.      Terroristic Threatening

Barrios argues that he can recover for his mental and emotional harm under Kentucky's negligence per se statute because Elmore has violated Kentucky's terroristic-threatening statute. (D.N. 52, PageID # 870) Kentucky law provides that a person is guilty of terroristic threatening in the third degree when "[h]e threatens to commit any crime likely to result in serious death or physical injury to another person." Ky. Rev. Stat. § 508.080(1)(a). Meanwhile, Kentucky's negligence per se statute provides that any person "who is injured by violation of any statute may recover from the offender such damages as he sustained by reason of the violation." Ky. Rev. Stat. § 446.070; *see also Sadler v. Advanced Bionics, Inc.*, 929 F. Supp. 2d 670, 681 (W.D. Ky. 2013) (explaining that § 446.070 codified the common-law tort of negligence per se). "This does not

mean, however, that any person can bring a claim for negligence *per se* against the violator of any statute." *Columbia Gas Transmission, LLC v. Raven Co.*, No. 12-72-ART, 2014 U.S. Dist. LEXIS 132174, at *18 (E.D. Ky. Sept. 17, 2014). Instead, the plaintiff must be within the class of persons the statute was designed to protect and the injury suffered must be an event that the regulation was designed to prevent. *Id.* (citing *Shrout v. The TFE Grp.*, 161 S.W.3d 351, 355 (Ky. Ct. App. 2005)). The plaintiff must also prove causation and injury. *Id.* (citing *Stivers v. Ellington*, 140 S.W.3d 599, 601 (Ky. Ct. App. 2004)). For purposes of this motion, Elmore does not dispute that Barrios suffers from mental-health issues such as depression. (D.N. 49, PageID # 825) Elmore appears only to be challenging causation. (*See id.*, PageID # 836) For the reasons explained below, the Court finds that Barrios has established a genuine issue of material fact as to causation.

### 1. Violation of Statute

Third-degree terroristic threatening "simply requires that the defendant threaten to commit any crime likely to cause death, serious physical injury or substantial property damage." *Mullikan v. Commonwealth*, 341 S.W.3d 99, 103 (Ky. 2011). According to Barrios, Elmore threatened to kill him, specifically stating that he would "put a knife . . . up [Barrios's] throat." (D.N. 48, PageID # 509) Elmore has conceded—for summary judgment purposes—that such a threat was made, although he states that he intends to "vigorously contest" this issue at trial. (D.N. 49, PageID # 835) Regardless, Elmore does not appear to dispute that if the threat occurred as described by Barrios, Elmore threatened a crime likely to cause death or serious physical injury when he told Barrios that he would put a knife up Barrios's throat. (D.N. 49, PageID # 835) Thus, viewing the facts in the light most favorable to Barrios, the Court finds that the statutory requirements for third-degree terroristic threatening are met. *See* Ky. Rev. Stat. § 508.080(1)(a).

## 2. Causation

In order for a plaintiff to recover under § 446.070, the statutory violation "must be the direct and proximate cause of the injury complained of. A recovery of damages from another may not be sustained merely because such other has violated a statute." *Pike v. George*, 434 S.W.2d 626, 628 (Ky. 1968 (quoting *Pirtle's Admin'x v. Hargis Bank & Tr. Co.*, 44 S.W.2d 541 (Ky. 1931)). Barrios must therefore prove that Elmore's threat was the proximate cause of his emotional distress—i.e., that Elmore's conduct was a "substantial factor in bringing about the harm." *Ventas v. Health Care Prop. Invs., Inc.*, 635 F. Supp. 2d 612, 624 (W.D. Ky. 2009) (citing *Bailey v. N. Am. Refractories, Co.*, 95 S.W.3d 868, 871 (Ky. Ct. App. 2001)). Generally, under Kentucky law, proximate cause is determined based on "whether the injury is a natural and probable consequence of the negligent act, which test involves the element of foreseeability." *Sidebottom v. Harrisburg Masonry*, No. 95-6195 and No. 95-6216, 1996 U.S. App. LEXIS 28241, at *8 (6th Cir. Oct. 25, 1996) (quoting *Ohio Cas. Ins. Co. v. Commonwealth, Dep't of Highways*, 479 S.W.2d 603, 605 (Ky. 1972)). "If reasonable minds could differ on the issue, the question is for the jury." *Id.*

Elmore argues that his threat was not a substantial factor in bringing about Barrios's harm for the following reasons: (1) Barrios has not been diagnosed with Post-Traumatic Stress Disorder or any other mental-health condition besides general depression, and Barrios does not have any expert testimony linking his mental distress to Elmore's actions; (2) there was no physical altercation; (3) Barrios did not take any actions indicating that he took Elmore's threats seriously; and (4) Barrios's medical records do not support causation and Elmore's expert, Dr. Allen, believes Barrios's emotional distress was caused by losing his tenure-track job. (D.N. 49, PageID # 836-39) The Court will address each argument in turn.

### a. Lack of Expert Testimony or Specific Diagnosis

Elmore first argues that Barrios lacks sufficient evidence to prove that the alleged threat caused his injuries. (*Id.*, PageID # 836) As an initial matter, the Court notes that Barrios has disclosed as experts his treating physician and treating therapist, both of whom will testify as to causation. (D.N. 58) In any event, as acknowledged by Elmore, expert testimony is not required to recover emotional-distress damages for statutory causes of action—such as Counts I and II here. *See MacGlashan v. ABS Lincs KY, Inc.*, 84 F. Supp. 3d 595, 605 (W.D. Ky. 2015) (finding that the requirement for expert testimony is limited to NIED and IIED claims). (D.N. 49, PageID # 829, 841) Rather, a plaintiff can rely on their own testimony to establish emotional-distress damages. *See Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12 (Ky. 2017) (specifically declining to require a plaintiff to prove emotional distress by expert medical or scientific proof, finding that "emotional distress may be proven by direct or circumstantial evidence, including the plaintiff's testimony alone."). Accordingly, the Court may look to Barrios's testimony to establish whether there is a genuine issue of material fact as to causation.

Further, Elmore cites no authority—and the Court is aware of none—to show that Barrios must have been diagnosed with a specific condition such as PTSD in order to prove causation. *See, e.g.*, *Winkler v. Petersilie*, 124 F. App'x 925, 934 (6th Cir. 2005) ("Physical manifestations of emotional distress and evidence that a plaintiff suffered from nightmares, insomnia, and depression, or sought medical or psychiatric treatment may support a claim for serious mental injury." (citation omitted)). Finally, although Elmore argues that Barrios's statements as to the cause of his symptoms were equivocal (D.N. 49, PageID # 836), Barrios testified that his mental and emotional distress are solely attributable to Elmore's actions on September 6, 2017. (D.N. 48,

PageID # 426-28)  Barrios further claims that the September 6 incident has affected his ability to concentrate and his energy level.  (*Id.*, PageID # 429)

### b. Physical Altercation

Elmore likewise points to no authority suggesting that a physical altercation is necessary for Barrios to have suffered emotional distress.  (*See* D.N. 49, PageID # 836)  As explained above, a violation of Kentucky's terroristic-threatening statute merely requires "that the defendant *threaten* to commit any crime likely to cause death, serious physical injury or substantial property damage."  *Mullikan*, 341 S.W.3d at 103 (emphasis added).  Elmore does not make any argument that his alleged threat does not meet this standard.  (*See* D.N. 49; D.N. 56)

### c. Barrios's Actions Following Incident

Elmore also argues that Barrios did not take any actions indicating that he took Elmore's threats seriously because Barrios (1) did not call anyone for help after the incident, including the police or campus security; (2) followed Elmore into a laboratory containing dangerous chemicals; and (3) emailed Elmore shortly after the incident offering to meet with Elmore but did not mention the physical threats.  (D.N. 49, PageID # 837-38)  Barrios has presented a genuine issue of material fact as to each of these points, however.  First, Barrios testified that he did not call for help after the incident because he did not know what to do and because it was difficult for him to process what had just happened.  (D.N. 48, PageID # 419, 423)  Specifically, Barrios said that he did not "know what was going through [Elmore's] head when he walked away," but that Elmore left "pretty upset, and after he said he was going to kill me, you know, I had a concern.  I was really concerned about it."  (*Id.*, PageID # 418)  Although Barrios did not call anyone on the day of the incident, Holt said that Barrios called him the next day and described the incident.  (D.N. 48-3, PageID # 604)  In his statement to Bellarmine, Holt explained that Barrios decided to call him to

decide how to proceed "[a]fter thinking it over for a day" and that Barrios told him he feared for his life and did not feel comfortable having Elmore work in his research lab. (*Id.*) According to Holt, it was clear that Barrios was frightened and that he was fearful of retaliation. (*Id.*)

As to Elmore's second point, Barrios testified that he followed Elmore into the laboratory because he "still did not know what was going on or what to do, or why Elmore was walking [toward the lab]." (D.N. 48, PageID # 512) Barrios explained that he followed Elmore because he "wanted to make sure that [Elmore] wasn't actually going to grab a bottle of acid or chemical[s] or something and come back and threaten [him]." (*Id.*) As to his offer to meet with Elmore, Barrios testified that he was not planning to meet with Elmore one-on-one, and that the email did not mention the physical threats because Barrios did not want to "seed in [Elmore]'s head the idea that he could actually hurt me again." (*Id.*, PageID # 521) Barrios also testified that he changed his mind and was no longer willing to meet with Elmore the same night he sent Elmore the original email. (*Id.*, PageID # 519) Barrios then emailed Elmore the next day saying that he was willing to set up a meeting between Elmore and Holt instead. (*Id.*, PageID # 524)

While Elmore argues that Barrios's willingness to be in a room with him constitutes further evidence that Barrios did not take the threats seriously, Elmore appears to have cherry-picked a portion of the deposition testimony. (*See* D.N. 49, PageID # 838) In Barrios's deposition, the exchange actually occurred as follows:

> Q: So it's fair to say as of September 8th of 2017 at 2:31 p.m., you were willing to be in a room with Caleb?
> A: *With another person as well*.
> Q: But you were willing to be in a room with him?
> A: Correct.

(D.N. 48, PageID # 524 (emphasis added)) A meeting of Elmore, Holt, and Barrios was scheduled for September 11, 2017. (*Id.*, PageID # 525) The meeting was rescheduled, though it is unclear

whether Barrios or Holt made the decision to reschedule the meeting. (*Id.*) According to Barrios, however, he decided to reschedule the meeting because he "didn't feel comfortable being with [Elmore] in the same room." (*Id.*) When the university began an investigation into Barrios's formal complaint regarding Elmore's conduct, Barrios emailed that he decided not to be present during Elmore's hearing because participating in the hearing would be interfering with Elmore's future, and Elmore had said "If you f*** with my future, I will kill you." (*Id.*, PageID # 534) Barrios said he did not want to participate because he wondered, "Why would I put myself in a situation where I'm going to get killed?" (*Id.*) In short, the record contains several indications that Barrios took Elmore's threats seriously.

### d.    Barrios's Medical Records and Elmore's Expert

As to Elmore's final argument, Barrios went to see his family physician about his mental distress in June 2018. (*Id.*, PageID # 399) When Barrios discussed possible depression with Dr. Weber on June 6, 2018, Weber noted that Barrios's mood and affect were normal, and did not prescribe any medication or therapy. (D.N. 49, PageID # 839) Weber noted in Barrios's medical records, however, that Barrios reported weight loss of about ten pounds that he attributed to stress. (D.N. 49-1, PageID # 852) Barrios went to Dr. Weber again on September 19, 2018, to discuss mental-health concerns, saying that he wanted to "start something for his stress." (*Id.*, PageID # 849) Weber diagnosed Barrios with situational depression, prescribed him antidepressants, and referred him to a social worker for therapy. (D.N. 48, PageID # 404; D.N. 49, PageID # 839) Barrios then began seeing a therapist in October 2018. (D.N. 48, PageID # 402) According to Barrios, he hit bottom around that time after several months "of trying to deal with it by [him]self" with his symptoms getting "worse and worse instead of getting better." (*Id.*,

PageID # 436-37)  Barrios denied that he went to see a therapist in October because he had received requests asking for mental-health records.  (*Id.*, PageID # 436)

While Elmore has the expert opinion of Dr. Allen, Allen's opinion comes only from reading the record.  He has not treated, spoken to, or even met Barrios.  On the other hand, Barrios has identified his treating physician and treating therapist as experts and noted that he may call these individuals to testify.  (D.N. 58, PageID # 1009-10)  Specifically, it is anticipated that they will testify that Barrios's "ongoing emotional distress is likely the result, in whole or in substantial part, within a reasonable degree of medical [and therapeutic] probability," of the September 6, 2017 incident.  (*Id.*)  This is therefore a classic "battle of the experts, and it is up to the jury to evaluate what weight and credibility each expert opinion deserves."  *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (citation omitted).  Further, although Allen opined that Barrios's emotional distress was more likely caused by the loss of his "tenure-track job at a prestigious institution" or his cancer scare (D.N. 38-1, PageID # 287; D.N. 53-1, PageID # 997), no expert opinion is required for this claim, and Barrios's testimony contradicts Allen's opinion.  *See supra* Part I, Part II(A)(2)(a).  Barrios attributes all his symptoms solely to the September 6 incident. (D.N. 48, PageID # 409)  The Court agrees that when viewing the evidence in the light most favorable to Barrios, a reasonable jury could find that feelings of being watched and fearing for one's life are not reactions typically associated with losing one's employment.  (*See* D.N. 52, PageID # 867)

In further conflict with Allen's opinion is Barrios's testimony that he was not depressed due to his termination and that it was nothing he "couldn't control or handle later on." (D.N. 48, PageID # 393-94)  Barrios testified that there was "no need for [him] to just sit over his termination

letter and . . . just look at it over and over again and feel sad for the rest of [his] life." (*Id.*, PageID # 407-08)  Barrios explained:

> What I cannot move on with is [Elmore] telling me that he will put a knife up my throat . . . because the more I think about it, the more it hunts me down.  I don't feel safe.  I never felt safe after that at Bellarmine, and I don't feel safe afterwards.  Okay.  That I cannot move on.

(*Id.*, PageID # 407-08)  Barrios likewise testified that there was "no reason to be upset" about the threat of lymphoma, and that it was nothing he could not handle with the help of doctors.  (*Id.*, PageID # 435)  Based on the above, the Court agrees that genuine issues of material fact exist as to "the severity of Barrios's emotional distress and whether and/or to what extent it is related to Elmore threatening to kill him."  (D.N. 52, PageID # 864)  Barrios has presented sufficient evidence through his testimony, the expected testimony of his doctors, and the medical record to create a genuine issue of material fact as to the cause of his mental distress "because there are disputes over facts that might affect the outcome of the suit."  *Anderson*, 477 U.S. at 248.

## B.       Assault

Under Kentucky law, assault is "a tort which merely requires the threat of unwanted touching of the victim."  *Hickey v. Hayse*, 188 F. Supp. 2d 722, 730 (W.D. Ky. 2001) (quoting *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001)).  "Recovery for emotional distress caused by traditional torts such as assault or battery has always been allowable as an element of damages in an action based upon those torts."  *Isert v. Ford Motor Co.*, No. 3:01CV-258-S, 2003 U.S. Dist. LEXIS 11900, at *5 (W.D. Ky. June 26, 2003) (citing *Banks*, 39 S.W.3d at 480).  Although Elmore moves for summary judgment on all three remaining counts (D.N. 49, PageID # 829), he makes no arguments as to Barrios's assault claim (Count II).  Elmore makes no reference to either "assault" or "Count II" in his motion for summary judgment beyond conceding that Barrios is not required to have an expert establish his symptoms for Count II.  (*See* D.N. 49,

PageID # 841).  Elmore's only reference to assault in his Reply is arguing that a case cited by Barrios to support his claims for assault and terroristic threatening does not address causation (D.N. 56, PageID # 1002); the Court has already addressed causation above.

"It is the defendant's burden at the summary judgment stage to make an initial showing that the plaintiff lacks evidence for a claim."  *Dixon v. Neubacher*, No. 1:12-CV-1213, 2015 U.S. Dist. LEXIS 41691, at *31 (N.D. Ohio Jan. 27, 2015) (citing *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001)).  "Only when the defendant has made such a [showing] does the burden then shift to the plaintiff."  *Id.*  Here, Elmore's failure to properly raise an argument in his summary-judgment motion relieves Barrios of the burden to come forward with specific facts in support of his assault claim.  *See Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 725-26 (6th Cir. 2000). Accordingly, no further analysis is required as to Count II.  *See Dixon*, 2015 U.S. Dist. LEXIS 41691, at *31.

**C.      Intentional Infliction of Emotional Distress**

Barrios argues that Elmore's death threats support a cause of action for intentional infliction of emotional distress.  (D.N. 52, PageID # 868)  Under Kentucky law, "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results to the other from it, for such bodily harm."  *Torres v. Am. Employers Ins. Co.*, 152 F. App'x 402, 413 (6th Cir. 2005) (quoting *Craft v. Rice*, 671 S.W.2d 247, 251 (Ky. 1984)).  The elements of an IIED claim are as follows:

    (1)  the wrongdoer's conduct was intentional or reckless;
    (2)  the conduct must be outrageous and intolerable in that offends against the generally accepted standards of decency and morality;
    (3)  there must be a causal connection between the wrongdoer's conduct and the emotional distress; and
    (4)  the distress suffered must be severe.

*Bargo v. Goodwill Indus. of Ky., Inc.*, 969 F. Supp. 2d 819, 826 (E.D. Ky. 2013) (citing *Osborne v. Payne*, 31 S.W.3d 911, 913-14 (Ky. 2000)).

Elmore argues that Barrios's IIED claim should be dismissed because Barrios has not established a genuine issue of material fact as to whether he is suffering from a severe or serious emotional injury, as shown by an expert. (D.N. 49, PageID # 842) Specifically, Elmore argues that (1) no reasonable jury could conclude that Barrios's emotional distress was anything other than the "ordinary, everyday emotional harm" not actionable under Kentucky IIED law; (2) Barrios's failure to produce expert or scientific proof of severe emotional distress is fatal to his IIED claim; and (3) there is insufficient evidence as to causation. (*Id.*, PageID # 836, 843-45; D.N. 56, PageID # 1000) Elmore therefore appears to be contesting only the final two requirements for an IIED claim—causation and severe distress. The Court will address each element in turn.

## 1. Causation

As explained above, Barrios has established a genuine issue of material fact as to whether Elmore's threats caused his emotional distress. Elmore is correct, however, that unlike Counts I and II, Barrios's IIED claim requires expert medical or scientific proof. *See Osborne v. Keeney*, 399 S.W.3d 1, 18 (Ky. 2012) ("A plaintiff claiming emotional distress damages must present expert medical or scientific proof to support the claimed injury or impairment."); *see also MacGlashan v. ABS Lincs KY, Inc.*, 84 F. Supp. 3d 595, 605 (W.D. Ky. 2015) (holding that "*Osborne*'s requirement for expert testimony is limited to NIED and intentional infliction of emotional distress claims.")

Elmore argues that Barrios lacks the requisite proof to defeat summary judgment because "an expert opinion which is entirely conclusory and unsupported by specific data is insufficient to

create a genuine issue of fact" and Barrios "offers no evidence to support his conclusion on causation besides his own self-serving testimony and conjecture." (D.N. 49, PageID # 845; D.N. 56, PageID # 999) As explained above, however, Barrios has disclosed his treating family physician and clinical therapist as experts who will testify at trial as to the cause of his symptoms.[4] (D.N. 58, PageID # 1009-10) Accordingly, Barrios has provided sufficient medical proof of causation to survive summary judgment on his IIED claim. *See Osborne*, 399 S.W.3d at 18.

### 2. Severe Distress

Elmore argues that Barrios has failed to satisfy the "severe distress" prong of his IIED claim because (1) Barrios failed to seek any medical treatment for his emotional distress until more than a year after the incident; and (2) no reasonable jury could conclude that the emotional distress suffered by Barrios was "anything more than the ordinary, everyday emotional harm that is not actionable under Kentucky IIED law." (D.N. 49, PageID # 845) "[T]o meet the standard of severe emotional distress the injured party must suffer distress that is 'substantially more than mere sorrow.'" *Bargo*, 969 F. Supp. 2d at 828 (quoting *Benningfield v. Pettit Envtl., Inc.*, 183 S.W.3d 567, 572 (Ky. Ct. App. 2005)). Elmore specifically argues that "distress that does not significantly affect the plaintiff's everyday life or require significant treatment will not suffice." (*Id.*, PageID # 843 (quoting *Osborne*, 399 S.W.3d at 17)). As discussed above, however, Barrios testified that the emotional distress caused by Elmore has affected various aspects of Barrios's

---

[4] Elmore filed his motion for summary judgment (D.N. 49) before Magistrate Judge Regina S. Edwards had ruled on Elmore's earlier motion to compel discovery responses related to Barrios's experts (D.N. 34). In that motion, Elmore argued that Barrios was required to respond to the document request because although Barrios's experts were not "retained," he intended to offer their "opinion testimony regarding causation and damages." (D.N. 34, PageID # 227) On February 12, 2019, Judge Edwards granted Elmore's motion to compel responses "to the extent that [Barrios] must supplement his expert disclosures and discovery responses related to his treating physicians." (D.N. 57, PageID # 1007-08) Barrios filed an amended and supplemental witness disclosure on February 15, 2019. (D.N. 58)

everyday life and that his symptoms are a daily occurrence and "last all the time." (D.N. 48, PageID # 426)

Moreover, Barrios's treating physicians will testify that his emotional distress is significant and persistent. (D.N. 58, PageID # 1009-10) Specifically, Weber will testify that Barrios's emotional distress progressed to such a degree that she found it reasonable and necessary to refer him for outside treatment and counseling, and that Barrios "has exhibited unexplained physical symptoms that may be manifestations of and/or related to such emotional distress and anxiety resulting from" the September 6, 2017 incident. (*Id.*) Barrios described these physical symptoms as lumps on his neck, weight loss, night sweats, and inability to sleep. (D.N. 48, PageID # 405) As explained above, Barrios's medical records also show that he has been diagnosed with situational depression and is currently taking antidepressants (D.N. 48, PageID # 404; D.N. 49, PageID # 839; D.N. 49-1, PageID # 849), and that he has had suicidal thoughts (D.N. 48, PageID # 424, 438). Barrios testified that he is now scheduled to see a therapist once a month. (*Id.*, PageID # 438)

In light of this evidence, the Court finds that there is a genuine issue of material fact as to whether Barrios is suffering from severe emotional distress. *See, e.g.*, *Suiter v. Logan Cty.*, No. 1:12CV-155-JHM, 2014 U.S. Dist. LEXIS 183110, at *38-*39 (W.D. Ky. Oct. 24, 2014) (finding that plaintiff presented sufficient evidence to allow a jury to find that her distress was "substantially more than mere sorrow" when she was diagnosed by her doctor with serious depression and anxiety, problems of sleeplessness, nightmares, crying, low energy, times of nervous energy, lack of motivation, concentration and memory problems, decreased appetite, hopelessness, escape wishes, isolating irritability and nervousness); *Burgess v. Taylor*, 44 S.W.3d 806, 812 (Ky. Ct. App. 2001) (finding severe emotional distress where a plaintiff established she "broke down,"

suffered from many panic attacks, had major problems with high blood pressure, suffered from anxiety and depression, and contemplated suicide). Accordingly, Barrios's IIED claim survives summary judgment.

**III.**

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** that Caleb Elmore's motion for summary judgment (D.N. 49) is **DENIED**.

January 2, 2020

**David J. Hale, Judge**
**United States District Court**